**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIA V., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 1538 |
| | ) | |
| ELISA CORONA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Elisa Corona's (Corona),

Defendant Sousan Bahavar's (Bahavar), Defendant Alicia Pickett's (Pickett),

Defendant Roi Montalvo's (Montalvo), Defendant Stany D'Souza's (D'Souza), and

Defendant DCFS Director Erwin McEwen's (McEwen)(collectively, "DCFS

Defendants") motion to dismiss the claims brought against them in their official

capacity. For the reasons stated below, the partial motion to dismiss is denied.

**BACKGROUND**

Plaintiff Maria V. and her minor children, Plaintiff S.G. and Plaintiff B.G.,

allege that in July 2008, S.G. reported to Maria V. that her father, H.G., had sexually

abused her.  H.G. allegedly denied that he had sexually abused S.G., and Maria V.

allegedly discussed what to do with her personal counselor.  Shortly after, Maria V.'s

counselor called an Illinois Department of Children and Family Services (DCFS)

Hotline to report S.G.'s claim of sexual abuse, as required by Illinois law.  Pickett

and Corona, as investigators for DCFS, allegedly each went to the family's home in

July of 2008 to investigate the matter.  Defendant Child Advocacy Center of

Hoffman Estates (CAC) allegedly then interviewed S.G. and B.G., and after the

interview, the allegations of sexual abuse were determined to be "unfounded."

In October 2008, another issue arose and H.G. again allegedly denied any

wrongdoing.  Maria V. then allegedly contacted Corona, who instructed Maria V. to

report the matter to the police.  The police allegedly searched the family's home and

found a pornographic video among the children's PlayStation games.  Maria V. and

H.G. allegedly separated shortly thereafter, and H.G. moved to another residence.

In late October 2008, Maria V. allegedly informed the children's doctor that

she suspected that the children had been sexually abused by H.G., and B.G. allegedly

reported instances of sexual abuse to the doctor and to Maria V.  Allegedly, a CAC

employee later interviewed the children in the presence of Corona and others.  In

addition, Maria V. was allegedly questioned regarding her marital relationship, was

informed that the children had not reported any sexual abuse during the CAC

interviews, and was accused of making false reports against H.G.  Plaintiffs claim

that no official notice of this allegation against Maria V. was ever provided to her

and that, regardless, such "coaching" does not constitute child abuse. Plaintiffs also

claim that Corona, allegedly with the support of her supervisor, Bahavar, "relied

upon a ground for DCFS intervention against a parent that did not exist as a matter of

law." (A Compl. Par. 37).  In late November 2008, Maria V. allegedly received

notification that, after conducting a second investigation, DCFS had concluded that

both the allegations of child abuse against her husband and the allegation of

"coaching" against her were determined to be "unfounded."

In February 2009, Maria V.'s children allegedly began counseling with

Miriam Lopez (Lopez) at a center that provides services to victims of sexual assault.

In late May 2009, Maria V. and H.G. divorced and Maria V. was awarded primary

custody of the children pursuant to a Joint Parenting Agreement (Agreement).

Pursuant to the Agreement, Maria V. and H.G. worked out a visitation schedule that

did not include any overnight visits with H.G.  After the divorce, both children

allegedly continued to report that H.G. had abused them at the family's home prior to

Maria V.'s and H.G.'s separation.  Plaintiffs allege that Maria V. again reported this

information to her counselor and that, based on her counselor's advice, Maria V.

called the DCFS Hotline to report the abuse.

Shortly after, Corona allegedly began investigating the new allegations of abuse and, on July 1, 2009, Corona removed S.G. and B.G. from Maria V.'s custody for one day, allegedly with no safety plan, court order, or any other legal authority. Approximately three weeks later, Corona allegedly informed Maria V. that the third investigation had been closed and that DCFS had again determined the allegations of sexual abuse against H.G. to be "unfounded." Bahavar also allegedly communicated this information to Lopez and also told Lopez that Bahavar believed that Maria V. might be "coaching" the children to make false reports of sexual abuse against H.G. Lopez allegedly indicated to Bahavar that Lopez did not believe such coaching had occurred, and Bahavar allegedly indicated to Lopez at that time that the investigation against Maria V. regarding the alleged coaching would likely be resolved as "unfounded" and the case transferred to an intact family services team, with referrals for H.G. to complete a sex offender evaluation and Maria V. to undergo a psychological examination.

After the close of the third investigation, the children's visits with H.G. allegedly resumed, and soon thereafter S.G. allegedly began to have problems sleeping. In November 2009, S.G. allegedly reported further sexual abuse to her aunt, who reported the information to the DCFS Hotline. CAC allegedly interviewed the children, but a DCFS investigator allegedly told Maria V. that DCFS could not

accept the new report. In addition, S.G. allegedly reported additional incidents of sexual abuse to Lopez in therapy sessions that occurred throughout November 2009. Lopez allegedly attempted to contact DCFS regarding S.G.'s statements at least three times in late November 2009, and was allegedly informed by Corona in December 2009 that a sex offender evaluation suggested there was some likelihood that H.G. was a sex offender and that there was a recommendation that H.G. have no further contact with the children. In late December 2009, DCFS allegedly authorized H.G. to speak with the children, and in January 2010, DCFS allegedly authorized H.G. to see the children.

In early January 2011, an additional report of sexual abuse was allegedly made, and thereafter, DCFS investigator Celmira Bolanos (Bolanos) allegedly forced Maria V. to sign a safety plan placing the children in the custody of their babysitter and prohibiting Maria V. from having contact with the children. Bolanos allegedly took such actions without DCFS ever having provided Maria V. with any documentation of any allegations made against her. Corona was allegedly also involved in this investigation and allegedly required the children to submit to an interview at CAC. A short time later, Bolanos allegedly accused Maria V. of coaching the children, but indicated that the children could return to Maria V.'s custody and be contacted by H.G. DCFS later "unfounded" the case against H.G.

In March 2010, both children allegedly exhibited sleep disturbances. In early April, a DCFS Investigator identified as "Ms. Rivera" (Rivera) allegedly went to Maria V.'s home to enroll her in a program that would permit the children to continue counseling with Lopez. Later that day, Rivera allegedly informed Maria V. that H.G. had passed all evaluations that DCFS had subjected him to and denied that any of the evaluations had shown some likelihood that H.G. was a sex offender. Rivera also allegedly denied that Lopez had ever made any reports to the DCFS Hotline, accused Maria V. of making all the Hotline reports and coaching the children, and threatened to remove the children from Maria V.'s custody.

The children's sleep disturbances and reports of sexual abuse allegedly continued in April and May 2010. Lopez allegedly again reported the abuse to the DCFS Hotline. DCFS Investigator Esther Cordova, after conducting an interview with the children, allegedly accused Maria V. of coaching the children. DCFS allegedly again took the children into state custody without providing Maria V. any documentation regarding any allegations against her. In addition, at the close of the investigation, DCFS allegedly again "unfounded" the allegations against H.G.

In December 2010, the children allegedly made additional allegations of sexual abuse to Lopez, which Lopez allegedly reported via the DCFS Hotline. Allegedly Corona, under the supervision of Bahavar, conducted another

investigation.  On January 10, 2011, Corona allegedly requested that Maria V. bring

the children to CAC to be interviewed.  There, Maria V. was allegedly accused of

coaching her children, and the children were allegedly removed from Maria V.'s

custody without her consent and without probable cause or a reasonable suspicion

that Maria V. had abused or neglected her children or that the children were in

imminent risk of harm from Maria V.  Upon removal from Maria V's custody, the

children were allegedly placed in the custody of H.G. under another safety plan,

despite Maria V.'s alleged protests.  Maria V. was allegedly instructed to leave CAC

without her children.  Plaintiffs allege that, pursuant to DCFS policy, Bahavar's

supervisors, Montalvo and/or D'Souza, would have been required to approve the

removal of the children from Maria V.'s custody without her consent and the

placement of the children with H.G.  In addition, Plaintiffs allege that CAC also

participated in or permitted DCFS' removal of the children from Maria V.'s custody

without her consent.

On January 25, 2011, Maria V. allegedly received a copy of a safety plan

signed by H.G., which prohibited Maria V. from contacting her children and required

Maria V. to submit to a psychological evaluation.  On February 1, 2011, Maria V.

allegedly contacted Corona to request permission to see her children, since the safety

plan had allegedly expired by its terms.  Corona allegedly failed to respond to Maria

V., but communicated to H.G. that the safety plan was still in effect and that he should not permit Maria V. to have any contact with her children. Allegedly under the direction of Pickett, the children continued to reside with H.G. and the children's contact with Maria V. was allegedly limited to telephone calls until Maria V. agreed to submit to "an unspecified psychiatric assessment." (A Compl. Par. 70). Plaintiffs allege that at no time during the events described above did DCFS file a petition for temporary custody in the juvenile court, nor did any court ever modify Maria V.'s rights with respect to the custody of her children.

On February 18, 2011, Pickett allegedly informed Maria V. that H.G. had secured an order of protection against her. Plaintiffs allege that Maria V. did not receive any notice of such action against her or any copy of the order of protection. A short time later, H.G. allegedly offered to allow Maria V. to visit her children, and Maria V. allegedly sought permission from Corona to visit her children. Corona allegedly denied Maria V. access to the children because Maria V. had not submitted to a psychological evaluation. Maria V. allegedly indicated to Corona that she was never told where to go for such an evaluation, and Corona allegedly accused Maria V. of coaching the children and hung up on her. Plaintiffs allege that from January 10, 2011 until March 9, 2011, Maria V. was largely denied any contact with her children, and additionally that the children were denied access to needed counseling

during that time period. In addition, Plaintiffs allege that DCFS permitted Maria V. to regain custody of her children only after the filing of the complaint in this case and that H.G. is allegedly permitted to visit the children pursuant to a court order.

Plaintiffs further allege that in late April, 2011, S.G. made another report of sexual abuse, that Maria V. took S.G. to the hospital after S.G. made this report, that the hospital informed the police of S.G.'s report, and that the police directed that H.G. have no further contact with the children. After DCFS learned of these facts, two investigators allegedly visited Maria V.'s home and indicated that they are currently investigating the report. According to Maria V., H.G. has not denied this instance of reported sexual abuse, and has allegedly informed Maria V. that she could have complete custody of the children. In addition, on May 19, 2011, B.G. allegedly disclosed to school officials that H.G. had physically abused him, and Maria V. was allegedly informed by school officials that DCFS would be notified of this allegation.

Plaintiffs include in their Amended Complaint claims against Corona, Bahavar, Montalvo, and D'Souza, each in their individual capacities, and against CAC, alleging unlawful seizure in violation of the Fourth Amendment brought under 42 U.S.C. § 1983 (Section 1983) based upon the alleged seizure on January 10, 2011 (Count I), Section 1983 claims against Corona, Bahavar, Pickett, Montalvo, and

D'Souza, each in their individual capacities, alleging a violation of S.G. and B.G.'s

Fourth Amendment and due process rights based upon their alleged continued

seizure from January 10, 2011 until March 9, 2011 (Count II), Section 1983 claims

against Montalvo, D'Souza, Bahavar, Pickett, and Corona, each in their individual

and official capacities, alleging violations of procedural and substantive due process

(Count III), and Section 1983 due process policy claims against Montalvo, D'Souza,

Bahavar, Pickett, Corona, each in their individual and official capacities, and

McEwen, in his or her official capacity (Count IV).  DCFS Defendants move to

dismiss the claims brought against them in their official capacities in Counts III and

IV.

**LEGAL STANDARD**

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil

Procedure 12(b)(6) (Rule 12(b)(6)), a court must "accept as true all of the allegations

contained in a complaint" and make reasonable inferences in favor of the plaintiff.

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(stating that the tenet is "inapplicable

to legal conclusions"); *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750,

753 (7th Cir. 2002).  To defeat a Rule 12(b)(6) motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (internal quotations omitted)(quoting

in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint that

contains factual allegations that are "merely consistent with a defendant's liability

. . . stops short of the line between possibility and plausibility of entitlement to

relief." *Iqbal*, 129 S.Ct. at 1949 (internal quotations omitted).


**DISCUSSION**

DCFS Defendants argue (1) that the claim brought against McEwen should be

dismissed because Plaintiffs have not alleged that McEwen was personally involved

in the investigations at issue, (2) that the claims brought against DCFS Defendants in

their official capacities should be dismissed because they are barred by the Eleventh

Amendment, and (3) that the claims brought against DCFS Defendants in their

official capacities should be dismissed because Plaintiffs lack standing to sue for

prospective injunctive relief.


I.  Personal Involvement by McEwen

DCFS Defendants argue that the claim against McEwen should be dismissed

because Plaintiffs have not alleged that McEwen was personally involved in the

matters at issue.  A state actor can only be held individually liable under Section

1983 if he was "personally responsible for the constitutional deprivation." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003)(citations omitted)(internal quotations omitted). Therefore, a supervisor cannot be held individually liable under Section 1983 unless he "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Id.*(citations omitted)(internal quotations omitted). However, where a plaintiff alleges that a state actor was responsible for creating or maintaining policy, practices and customs that resulted in a constitutional violation, such facts are sufficient to allege personal involvement in the constitutional deprivation. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002)(indicating that a plaintiff could sufficiently plead a Section 1983 claim against a supervisor in his individual capacity by alleging that the supervisor "created policy, practices and customs" relating to the matters at issue in a case). Further, a plaintiff may bring a Section 1983 claim against a supervisor in his official capacity to challenge the official policies of a state entity. *See Hill v. Shelander*, 924 F.2d 1370, 1372-74 (7th Cir. 1991)(indicating that "in an official capacity suit the plaintiff alleges that the defendant was party to the execution or implementation of official policy or conduct by a government because the real party in interest is the entity").

In the instant action, Plaintiffs have sued McEwen in his official capacity,

seeking declaratory and permanent injunctive relief "to ensure that the policies and practices [alleged] are not applied to Plaintiffs in the future" and to ensure that in the future the children are not separated from Maria V. without due process of law. (A. Compl. Par 108). In support of their claim against McEwen, Plaintiffs have alleged that McEwen "is responsible for ensuring that DCFS policies and practices conform to Illinois and federal law." (A Compl. Par. 16). In addition, Plaintiffs have alleged that DCFS investigators "have a practice, custom and usage of disregarding the limitation of the scope of their authority as set forth in DCFS rules and written procedure," and as provided for under Illinois and federal law. (A. Compl. Par. 21, 26, 29, 110). Plaintiffs have further alleged that McEwen has permitted unlawful practices, customs, or usage to continue "despite his legal duty to ensure that employees of DCFS operate lawfully. . . ." (A. Compl. Par. 109, 112). Such facts are sufficient to state a Section 1983 claim against McEwen.

## II. Eleventh Amendment Bar

DCFS Defendants contend that the Eleventh Amendment bars the claims brought against them in their official capacities. In support of their argument, DCFS Defendants argue (A) that Plaintiffs have failed to sufficiently allege an ongoing constitutional violation, (B) that Plaintiffs are improperly seeking an order requiring

Case: 1:11-cv-01538 Document #: 56  Filed: 01/17/12 Page 14 of 19 PageID #:292

DCFS Defendants to conform their conduct to state law, and (C) that Plaintiffs are improperly seeking an order that would interfere with DCFS Defendants' state law mandate to investigate allegations of child abuse.

### A.  Whether Plaintiffs Have Alleged an Ongoing Constitutional Violation

DCFS Defendants argue that the claims brought against them in their official capacities are barred by the Eleventh Amendment because Plaintiffs have not alleged an ongoing constitutional violation or that Plaintiffs will likely be subject to constitutional violations in the future.  Under the Eleventh Amendment, "states, as sovereigns in our federal system, will not be held amenable to suit in federal court without their consent."  *Protestant Memorial Medical Center, Inc. v. Maram*, 471 F.3d 724, 728 n.3 (7th Cir. 2006).  In other words, the Eleventh Amendment generally "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities. . . ."  *Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept.*, 510 F.3d 681, 695 (7th Cir. 2007).  However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to the Eleventh Amendment bar on claims brought nominally against a state.

The Court held in *Young* that "a suit challenging the constitutionality of a state

official's action is not one against the State." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). The Court reasoned that "an unconstitutional enactment is 'void' and therefore does not 'impart to [the officer] any immunity from responsibility to the supreme authority of the United States.'" *Id.* (citing *Young*, 209 U.S. at 160). The court further reasoned that if "the State could not authorize the action, the officer was 'stripped of his official or representative character and [was] subjected to the consequences of his official conduct.'" *Pennhurst*, 465 U.S. at 102 (citing *Young*, 209 U.S. at 160). Therefore, under the *Young* exception, a plaintiff could "file suit[ ] against state officials [acting in their official capacities] seeking prospective equitable relief for ongoing violations of federal law." *Indiana Protection*, 603 F.3d 365, 371 (7th Cir. 2010)(internal quotations omitted)(quoting *Marie O. v. Edgar,* 131 F.3d 610, 615 (7th Cir. 1997)); *see also Vickery v. Jones*, 100 F.3d 1334, 1346-47 (7th Cir. 1996)(stating that "the *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law").

DCFS Defendants argue that Plaintiffs' alleged need for prospective injunctive relief is speculative and remote. In support of their argument, DCFS Defendants rely on Plaintiffs' allegation that H.G. has told Maria V. that "she could now 'keep the children' completely." (A. Compl. Par. 78). The Supreme Court has advised that

"[p]ast wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury'" and that the relevant inquiry is whether the alleged facts demonstrate a likelihood that a plaintiff's constitutional rights will again be violated. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983)(quoting *O'Shea v. Littleton,* 414 U.S. 488, 196 (1974)).  In this case, Plaintiffs have alleged that DCFS Defendants have violated their federal constitutional rights on multiple occasions by employing numerous unconstitutional policies or practices.  Plaintiffs have further alleged that there is a current investigation pending that Plaintiffs believe will result in further violations of their constitutional rights.  H.G.'s alleged informal statement that he is willing to give up his rights to the children does not negate the fact that Plaintiffs have alleged sufficient facts relating to alleged constitutional violations and have alleged sufficient facts relating to the likelihood that they might be subject to constitutional violations in the future.  This ruling is based on the facts alleged, which must be taken as true at the pleadings stage.  At the summary judgement stage, Plaintiffs will be required to point to sufficient evidence to support their claims.


    B.  Conformity to State Law

    DCFS Defendants argue that Plaintiffs' claims for injunctive relief must be dismissed because the Eleventh Amendment bars the court from ordering DCFS

Defendants to conform their conduct to state law. Notwithstanding *Young*, the

Eleventh Amendment precludes a federal court from ordering a state to conform its

conduct to state law. *Pennhurst*, 465 U.S. at 106 (holding that the exception

established in *Young* is inapplicable to "a suit against state officials [brought] on the

basis of state law"). In this action, Plaintiffs have not merely alleged that DCFS

Defendants violated state law. Plaintiffs have alleged federal constitutional

deprivations in addition to violations of state law. Therefore, the dismissal of

Plaintiffs' claims for injunctive relief pursuant to the Eleventh Amendment would

not be appropriate.


    C. Interference with State Law Mandate

DCFS Defendants argue that Plaintiffs' claims for injunctive relief must be

dismissed because the injunctive relief sought would restrain DCFS Defendants from

complying with their "statutory mandate to investigate reports of child abuse and

neglect" and would, in effect, "[prohibit DCFS] Defendants from following the law."

(Mem. 2, 8). The court is not entering an injunctive order at this juncture. Further,

even if the court were to enter the requested relief, it would not conflict with state

law since state law cannot authorize federal constitutional violations. *See Alden v.*

*Maine*, 527 U.S. 706, 747 (1999)(recognizing that the Constitution is "the supreme

law of the land"). Therefore, the dismissal of Plaintiffs' claims for injunctive relief pursuant to the Eleventh Amendment would not be appropriate at this juncture.

III. Plaintiffs' Standing to Sue for Prospective Injunctive Relief

DCFS Defendants argue that Plaintiffs lack standing to sue for prospective injunctive relief because Plaintiffs have failed to sufficiently allege that future harm to them is imminent. Pursuant to Article III of the United States Constitution, the court may only exercise jurisdiction over a plaintiff's claims if "an actual case or controversy" exists. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)(citations omitted). To satisfy the standing component of this requirement, "[a] plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id.* at 101-02 (citations omitted)(internal quotations omitted). As discussed above, Plaintiffs have alleged sufficient facts that not only have they suffered injury in the past, but that they are likely to suffer further injury in the near future as a result of official conduct. Therefore, Plaintiffs have standing to sue for prospective injunctive relief. Based on the above, the court denies DCFS Defendants' motion to dismiss the claims brought against them in their official capacities.

18

The court notes that, at this juncture, the court is merely ruling on the sufficiency of the allegations in the complaint, which must be accepted as true.  At this juncture, the court is not making any ruling on the merits of Plaintiffs' claims. The court, by this ruling, is not enjoining DCFS Defendants from acting in the best interests of children or otherwise engaging in any activities necessary to protect the safety of children, including the minor Plaintiffs.

## CONCLUSION

Based on the foregoing analysis, the court denies DCFS Defendants' partial motion to dismiss.


_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated:   January 17, 2012